WILLIAM KIBBONS, JR.,      )
            )
       Plaintiff,      )    No. 17-cv-03017
            )
     v.        )    Judge Edmond E. Chang
            )
DOUBLE JACK PROPERTIES, LLC  )
and CARL STRUMILLO,    )
            )
      Defendants.    )

## MEMORANDUM OPINION AND ORDER

William Kibbons brings this lawsuit against Double Jack Properties and Carl Strumillo, alleging that they failed to pay him overtime in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* R. 1, Compl. ¶ 42.[1] Kibbons also asserts claims under the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.*, and the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et seq. Id.* ¶¶ 42, 50.[2]

The parties now cross-move for summary judgment on the sole issue of whether Kibbons was an employee of Double Jack (and thereby protected by the statutes) or merely an independent contractor. Kibbons argues that he was an employee, while the Defendants insist that he was an independent contractor. R. 84; R. 87. At this stage, though, there are still too many factual disputes for either party to be entitled to summary judgment, so both cross-motions are denied.

---

[1]Citations to the docket are indicated by "R." followed by the docket entry.
[2]This Court has subject matter jurisdiction over the case under 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

# I. Background

The facts narrated below are undisputed unless otherwise noted.[3] Double Jack Properties owns a residential apartment complex in Bourbonnais, Illinois. R. 86, PSOF ¶ 1. Carl Strumillo oversees day-to-day operations at Double Jack. *Id.* ¶ 9.

The story begins in 2008, when Double Jack purchased the apartment complex from its previous owners, M&W Apartments. PSOF ¶ 7. Leading up to the purchase, Strumillo spoke to various tenants to learn more about the property; one of the tenants suggested that he reach out to Kibbons. *Id.* ¶ 10. When the two met, Strumillo learned that Kibbons had been working for M&W as a property manager since 2006. *Id.* ¶¶ 8, 11.

When Double Jack purchased the property, Strumillo offered to hire Kibbons to stay on at the apartment complex and "take care of everything." PSOF ¶ 12. Kibbons apparently agreed to this arrangement, although the parties never signed any written employment (or contractor) agreement. *Id.* ¶ 14. So nothing in writing set out what they understood their arrangement to be, and, indeed, there is no evidence that they even talked about the formal status of their relationship. Kibbons claims that he was never told that he was an independent contractor, nor was he ever identified on any documents as an independent contractor. *Id.* ¶¶ 13-14. In response, Double Jack insists that it *treated* Kibbons as an independent contractor from the

---

[3]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "PSOF" for Kibbons's Statement of Facts [R. 86]; "Def. Resp. PSOF" for the Defendants' response to Kibbons's Statement of Facts [R. 87-2]; "DSOAF" for the Defendants' Statement of Additional Facts [R. 87-2]; and "Pl. Resp. DSOAF" for Kibbons's response to the Defendants' Statement of Additional Facts [R. 95].

very start, including by issuing him IRS 1099 tax forms each year. R. 87-2, Def. Resp. PSOF ¶¶ 13-14.

In any event, from 2008 to 2017, Kibbons did indeed perform various tasks on behalf of Double Jack—routine maintenance work, minor repairs, preparing apartment units for rental, maintaining the grounds, snow plowing, fixing appliances, and painting. PSOF ¶ 12. Double Jack's marketing materials even advertised "onsite maintenance" as an amenity, and Strumillo also shared Kibbons's name with tenants as the person to call if they needed anything fixed. *Id.* ¶¶ 28-29. At some point, Kibbons also began taking a more active role in the leasing side of the business; he showed apartments to prospective tenants, conducted open houses, sent out rental applications, and obtained signatures for lease agreements. *Id.* ¶¶ 34-35. And even more, Kibbons would from time to time be asked to collect security deposits, collect rent checks, and deliver eviction notices on behalf of Double Jack (but the exact frequency of these assignments is disputed). *Id.* ¶¶ 37-39; Def. Resp. PSOF ¶¶ 37-39.

Over the course of their relationship, Strumillo and Kibbons exchanged "hundreds" of text messages related to work assignments. PSOF ¶ 31. Specifically, Strumillo would alert Kibbons to tasks that needed to be done on any given day, and Kibbons would work on those tasks as they were brought to his attention. *Id.* ¶ 32. And there were times when Kibbons would seek approval from Strumillo before buying equipment or materials to make sure that Double Jack would reimburse him. *Id.* ¶ 22. Strumillo did not, however, monitor the tasks that Kibbons completed on a day-to-day basis. *Id.* ¶ 21.

When he was initially hired, Kibbons was paid $18.00 an hour. PSOF ¶ 12. Kibbons, with the help of his wife, kept track of his daily hours worked, and Kibbons would then submit those records to Strumillo. *Id.* ¶¶ 16-17. It appears that Kibbons tracked his hours of his own volition; Strumillo did not require him to submit hours, nor did Strumillo independently verify Kibbons's hours. *Id.* ¶¶ 15, 21. Then, sometime in 2011, Strumillo informed Kibbons that the payment scheme would be switching from $18.00 per hour to a flat rate of $2,500 per month, because Double Jack could no longer afford Kibbons's hourly rate. Def. Resp. PSOF ¶ 12. So, from then on, Kibbons received the monthly flat rate, though he continued to track and submit his hours to Strumillo. PSOF ¶ 17.

Kibbons was terminated from his position in January 2017. PSOF ¶ 41. The rationale, at least in part, was that Kibbons had gotten into a conflict with another independent contractor working for Double Jack. *Id.* ¶ 40. When Kibbons left the job, he did not take any tools with him.[4] *Id.* ¶ 42.

Beyond these broad contours, the actual details of the exact relationship between Kibbons and Double Jack are heavily disputed. On the matter of payment, for instance, Double Jack insists that after the parties switched from hourly payment to the monthly payment scheme, Kibbons "never objected" and never alleged that he was owed any extra money. DSOAF ¶ 60. According to Double Jack, Kibbons only

---

[4]Strangely, Strumillo actually appears to have testified that when Kibbons left, "there were no tools left in the garage at all. There was nothing." Strumillo Dep. Tr. at 399:20-23. But because the Defendants have responded to this fact as "Undisputed" in the Local Rule 56.1 Statement, the Court will assume that Kibbons did not take any tools with him after he was terminated from Double Jack.

began to assert that he was entitled to extra payment *after* he was terminated from his position. *Id.* Kibbons, on the other hand, argues that he still expected to be compensated for the difference between what he was owed (that is, $18.00 an hour) and what he was getting paid ($2,500 a month); after all, Kibbons points out, he continued to submit hourly invoices to Double Jack even after the parties ostensibly switched to a monthly payment scheme, and he would not have kept tracking his hours unless he expected to be paid. Pl. Resp. DSOAF ¶¶ 59-60.

To Kibbons' way of thinking, Double Jack essentially held him out to tenants as an "onsite manager" for Double Jack; in support, Kibbons testified that "numerous documents" available to tenants identified Kibbons as the "onsite manager." PSOF ¶ 30; R. 86-1, Kibbons Dep. Tr. at 135:2-7. In response, Strumillo contends that he never represented to anyone that Kibbons was a "manager" *for* Double Jack. Def. Resp. PSOF ¶ 30. Rather, Strumillo would merely advise tenants that Kibbons was on-site and could provide maintenance if needed. *Id.*

The parties also dispute how much control Double Jack had over Kibbons. Double Jack asserts that Kibbons "maintained complete autonomy in the performance of his duties." DSOAF ¶ 61. Moreover, Kibbons "maintained his own hours and set his own schedule." *Id.* ¶ 48; Def. Resp. PSOF ¶ 33. Kibbons, in contrast, argues that Strumillo required him "to be onsite from day until night and available every day" and "that he needed to be there when Strumillo needed him to be there." Pl. Resp. DSOAF ¶ 48; PSOF ¶ 33. For example, Kibbons notes, Strumillo would tell him when apartment showings needed to be done without checking with Kibbons first

to see if he was available, even on Sundays. PSOF ¶ 36. Double Jack, of course, disputes this fact. Def. Resp. PSOF ¶ 36. And on the topic of apartment showings, Kibbons contends that in addition to his regular maintenance duties, he was also required to show apartments to prospective tenants, collect rent checks, deliver eviction notices, and collect security deposits. PSOF ¶¶ 35-39. Double Jack, though, asserts that these leasing-related activities were only assigned "[f]rom time to time," and were in no way part of Kibbons's "regular activities or that it was somehow a duty of his." Def. Resp. PSOF ¶¶ 37-39.

Similarly, the parties tell opposing stories about the equipment used by Kibbons; Double Jack argues that Kibbons "utilized his own equipment in providing services to Double Jack," DSOAF ¶ 49, while Kibbons counters that Double Jack, "as a matter of practice, reimbursed Kibbons for *all* the equipment that he would purchase and use," Pl. Resp. DSOAF ¶ 49 (emphasis added). Not only that, argues Kibbons, but Double Jack even provided him with a credit card to use for making purchases at Menard's (a hardware store). PSOF ¶ 24. Double Jack clarifies that it never provided Kibbons with a credit *card* with his own name on it, although the company concedes that Kibbons was given access to Double Jack's credit *account* at Menard's and Lowe's. Def. Resp. PSOF ¶¶ 24-25 (emphasis added).

Even the reason for Kibbons's termination is disputed. Kibbons claims that he was fired abruptly by text message after an interaction with another contractor and not because of his work. PSOF ¶¶ 40-41. Double Jack, however, asserts that Kibbons had actually been informed multiple times of "issues" leading up to his termination

and that Double Jack had "been receiving complaints from tenants for a litany of things." Def. Resp. PSOF ¶¶ 40-41.

Double Jack also asserts that Kibbons "hired and supervised his own crews to complete work at Double Jack." DSOAF ¶ 47. In support, Double Jack points to a declaration by Strumillo, R. 87-2, Exh. A, Strumillo Decl., as well as a 2009 invoice ostensibly created by Kibbons, R. 87-8, Exh. F, Burton Invoice. At the top of the invoice is a name, "Wilbur Burton." *Id*. The invoice proceeds to list several tasks, like "Safety Inspection" and "Paint," along with dates and hours worked; the bottom of the invoice notes that the total amount to be paid was $570.00 for 57 hours of work, so presumably $10 an hour. *Id*. And finally, in what appears to be different handwriting from the rest of the document, the invoice states: "Bill Kibbons hired workers as part of his crew to do work. He had these people do [1099] work that he directed." *Id*. Also of note is that there is a partially cut-off heading on the invoice that reads "Kibbons International." *Id*. In response, Kibbons argues that this invoice proves nothing. All it shows, asserts Kibbons, is that one person did some work for Double Jack over the course of a few days. Pl. Resp. DSOAF ¶ 47. And in fact, Kibbons did not even pay for the work; Double Jack did. *Id*. Indeed, on this point, Strumillo testified that Burton received a 1099 form from Double Jack, while still maintaining that Kibbons hired him. Strumillo Dep. Tr. at 101:3-6.

Speaking of Kibbons International, naturally the parties draw sharply different portraits of it. For its part, Double Jack argues that the entire time Kibbons was working for Double Jack, he actually operated his own company—Kibbons

International—through which he claimed income and tax deductions. DSOAF ¶¶ 51-53; R. 92, Kibbons Tax Return (sealed). For instance, Strumillo testified that when he first met Kibbons, Kibbons told him that he operated several businesses, including a handyman business, a snow-plowing business, and an appliance business. Strumillo Dep. Tr. at 60:1-5, 74:12-18; Strumillo Decl. ¶ 14. Double Jack also notes that, in 2014, Kibbons reported his Double Jack income on IRS Schedule C, which is entitled "Profit or Loss from Business (Sole Proprietorship)." Kibbons Tax Return at 6. On Schedule C, Kibbons lists his business as "Kibbons International" and lists his profession as "Marketing Sales." *Id*. He then claims $31,368 in gross business income. *Id*. He also claims $16,717 in expenses, which encompass car and truck expenses, insurance, legal and professional services, repairs and maintenance, supplies, office expense, and uniforms. *Id*. at 6-7. In response, Kibbons argues that he was only ever issued IRS Form 1099s in his personal capacity and never under Kibbons International, and that "the individuals who filed Kibbons'[s] tax return for him made the deductions based on the IRS Form 1099 that was issued while understanding that Kibbons believed he was an employee of Defendants." Pl. Resp. DSOAF ¶¶ 53-54, 58.

In addition to the tax filings, Double Jack also asserts that Kibbons would send invoices to Double Jack from Kibbons International, and Double Jack would in turn pay Kibbons with checks made out to Kibbons International. DSOAF ¶¶ 57-58; R. 87-2, Exh. E, Kibbons Invoices. Moreover, Double Jack points out that Kibbons took out his own commercial liability insurance policy for the Kibbons International business, DSOAF ¶ 56; R. 87-5, Exh. C, Kibbons Insurance Policy, and was also

leasing space for his business, DSOAF ¶ 55. Kibbons, on the other hand, is adamant that "Kibbons International is not and was not a functioning business at the time; it was a defunct Amway business that Kibbons previously operated." Pl. Resp. DSOAF ¶ 51. The only reason he might have sent invoices to Double Jack from Kibbons International was because he "simply used a form he had in his possession from his previous, defunct Amway business." *Id*. ¶ 58. And as for the checks made out to Kibbons International, Kibbons claims that he only received three such checks over a nine-year period; every other check he received was issued to Kibbons personally. *Id*. ¶ 57. Finally, Kibbons disputes ever taking out insurance or leasing space on behalf of Kibbons International. Pl. Resp. DSOAF ¶¶ 55-56.

Despite these myriad factual disputes, both parties now move for summary judgment on the issue of whether Kibbons was an employee or whether he was an independent contractor.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must "view the facts and draw reasonable inferences in the light most favorable to the" non-moving party. *Scott v. Harris*, 550

U.S. 372, 378 (2007) (cleaned up).[5] The Court "may not weigh conflicting evidence or make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (cleaned up), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

The sole question at issue in these cross-motions for summary judgment is whether Kibbons was an employee of Double Jack or instead was an independent contractor. Under the Fair Labor Standards Act (known as the "FLSA"), an employee is (unhelpfully) defined as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). To aid in drawing the line between employees and contractors, the Seventh Circuit has articulated six factors to be considered: (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials

---

[5]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the alleged employer's business.[6] *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1535 (7th Cir. 1987). No one thing is dispositive. *Id.* Rather, the considerations are ultimately meant to get at the "economic reality" of the working relationship, with a particular focus on whether the alleged employee is economically dependent on the employer. *Id.* at 1534. In other words, under the totality of the circumstances, was Kibbons more like an employee or more like an independent contractor?

In deciding cross-motions for summary judgment, the Court views the facts in the light most favorable to the respective non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). So, when the Court evaluates Kibbons's summary judgment motion, the Defendants get the benefit of reasonable inferences; conversely, when evaluating the Defendants' motion, the Court gives Kibbons the benefit of the doubt. Each motion will be addressed in turn.

---

[6]The parties do not dispute that the standards for determining employee status under the Illinois Minimum Wage Law and the Illinois Wage Payment and Collection Act are practically identical to the six-factor test articulated in *Lauritzen. See Callahan v. City of Chicago*, 78 F. Supp. 3d 791, 821 (N.D. Ill. 2015) ("Because the IMWL parallels the FLSA so closely, courts have generally interpreted their provisions to be coextensive, and so have generally applied the same analysis to both."); *Brown v. BCG Attorney Search*, 2013 WL 6096932, at *3 (N.D. Ill. Nov. 20, 2013) (noting that "the IWPCA's definition of employer is essentially identical to that of the FLSA") (citing *Andrews v. Kowa Printing Corp.*, 814 N.E.2d 198, 206 (Ill. 2004)) (cleaned up). So, the Court will go ahead and conduct the analysis under the FLSA standard, but the outcome applies to the IMWL and IWPCA claims as well.

### A. Double Jack's Motion

First up is the Defendants' motion for summary judgment. In short, Double Jack urges the Court to look past the individual *Lauritzen* factors and recognize that the "economic reality" of the situation was that Kibbons "operated his own for-profit business in the most tax advantageous way for himself." R. 101, Def. Reply Br. at 2. Kibbons, of course, argues the exact opposite, namely, that the economic reality—as evidenced by a straightforward application of the six factors—"unequivocally" shows that he was an employee. R. 94, Pl. Resp. and Reply Br. It is true that the *Lauritzen* factors "are not the exclusive means by which the ultimate determination can be made." *Simpkins v. DuPage Hous. Auth.*, 893 F.3d 962, 964-65 (7th Cir. 2018). And the Court acknowledges that the factors might not map perfectly onto the facts of this case. But they are nonetheless relevant, so the Court will go ahead and frame the analysis in accordance with the factors, while keeping in mind the overarching question of economic dependence. Because Kibbons is the non-moving party in this instance, all reasonable inferences will be drawn in his favor.

### 1. Employer Control

The first consideration is the nature and degree of control that Double Jack exercised over Kibbons's work. *Lauritzen*, 835 F.2d at 1536. "Evidence that reflects the employer's dominance over the manner and method of how work is performed tends to show that the individual was an employee under the control of the employer." *Jaworski v. Master Hand Contractors, Inc.*, 2013 WL 1283534, at *3 (N.D. Ill. Mar. 27, 2013) (cleaned up). In *Bulaj*, for instance, this factor weighed in favor of employee

status where a property management company had "full control" over a maintenance worker because it set his schedule, monitored the quality of his work, and disciplined him when the work did not meet certain standards. *Bulaj v. Wilmette Real Estate and Management Co., LLC*, 2010 WL 4237851, at *6 (N.D. Ill. Oct. 21, 2010). Courts have also found "control" where the employer created procedures or guidelines that workers were required to follow. *Solis v. Int'l Detective & Prot. Serv., Ltd.*, 819 F. Supp. 2d 740, 750 (N.D. Ill. 2011); *Harris v. Skokie Maid & Cleaning Serv., Ltd.*, 2013 WL 3506149, at *7 (N.D. Ill. July 11, 2013).

The Defendants insist that Kibbons exercised "complete autonomy in the performance of his duties." DSOAF ¶ 61. For instance, Kibbons allegedly "maintained his own hours, set his own schedule, and used his own equipment." *Id.* ¶ 48; R. 87-1, Def. Br. at 5. It is also undisputed that Strumillo would alert Kibbons to what needed to be done, but he did not otherwise monitor the tasks that Kibbons completed on a day-to-day basis. PSOF ¶¶ 21, 32.

The problem is that Kibbons tells a very different story, and because Kibbons is the non-moving party, all factual disputes must be resolved in his favor. Most prominently, Kibbons claims that Strumillo *required* him "to be onsite from day until night and available every day" and that "he needed to be there when Strumillo needed him to be there." Pl. Resp. DSOAF ¶ 48; PSOF ¶ 33. For instance, Kibbons testified that Strumillo "at one point" told him that he "had to be there from morning until night." Kibbons Dep. Tr. at 133:17-19. Kibbons also claims that Strumillo would simply tell him when apartment showings needed to be done without checking with

Kibbons first to see if he was available—the implication being that Kibbons was simply expected to be available for work at any time, even on Sundays (which Double Jack sharply disputes). Def. Resp. PSOF ¶ 36. Moreover, even if there was no formal schedule that Kibbons was required to follow, Kibbons implies that he was so overwhelmed with work that as a *practical* matter, he had to be onsite all day every day in order to finish his work on time. Indeed, Kibbons notes that he had trouble finding work elsewhere because of "the time commitments required of his position by Strumillo." Pl. Resp. and Reply Br. at 4.

To be fair, there are also some holes in Kibbons's story. For instance, did Kibbons *really* have to show up every single day for eight years, or was he ever allowed to take time off, such as for vacation or sick days? How quickly was he expected to complete assigned tasks?[7] Did Strumillo give him strict deadlines, or was he free to work at his own pace? Were there any procedures or standards that he was required to follow when tending to apartment units? When Strumillo gave Kibbons's contact information to tenants, was Kibbons expected to address every tenant concern that came up, or did he have the option to choose not to deal with certain tenant issues? Even without knowing the answers to any of these questions, what is clear is that the "extent and effect of [Kibbons's] autonomy remains in dispute." *Simpkins*, 893 F.3d at 966. And considering the competing inferences in the light most favorable

---

[7]Kibbons argues that Strumillo expected him to address tasks "as quickly as possible," but as far as the Court can tell, that expectation is not necessarily supported by the record. Pl. Br. at 2. Elsewhere in his briefing, Kibbons alleges that he received "near daily text messages telling him what work needed to be completed *that day*," but similarly, Kibbons's citation does not necessarily support that contention. Pl. Resp. and Reply Br. at 5 (emphasis added).

to Kibbons, a reasonable trier of fact could certainly find that Strumillo exercised sufficient control over Kibbons to weigh in favor of a typical employer-employee relationship.

## 2. Opportunity for Profit and Loss

The next factor assumes that an "independent contractor risks loss of an investment and has the opportunity to increase profits through managerial discretion." *Lauritzen*, 835 F.2d at 1536. The parties do not really address this factor in depth, but even so, it is clear that there are a whole host of factual disputes that preclude summary judgment in favor of Double Jack.

For instance, it is undisputed that for roughly the first three years of the working relationship, Kibbons was paid an hourly rate of $18.00. PSOF ¶ 12. But as explained above, the parties sharply dispute the degree to which Kibbons was allowed to set his own schedule and control his own hours. Def. Resp. PSOF ¶ 33. In general, "prearranged pay scales and situations that do not afford workers managerial discretion to adjust their hours or work more efficiently eliminate the opportunity for those workers to realize increased profits by adjusting their own performance." *Perez v. Super Maid, LLC*, 55 F. Supp. 3d 1065, 1077 (N.D. Ill. 2014). In other words, if Strumillo indeed required Kibbons to be at work every day from morning until night (as Kibbons claims), then there does not seem to be much that Kibbons could have done to increase the amount of money he was taking home each day—he would simply receive the hourly rate multiplied by the total number of hours that Strumillo required him to work, no more, no less. *See Skokie Maid*, 2013 WL 3506149, at *7

(strict enforcement of pre-arranged work schedule and hours weighed in favor of employee status); *Perez*, 55 F. Supp. 3d at 1077 (finding employee status where workers were "not allowed to vary their start and end times").

These same principles apply, perhaps with even more force, to the monthly payment scheme that the parties adopted in 2011. Def. Resp. PSOF ¶ 17. Assuming Kibbons had no discretion to set his own hours, PSOF ¶ 33, then he would have been paid the same even if he was "able to complete their work more efficiently than scheduled." *Perez*, 55 F. Supp. 3d at 1077. Regardless of the number of jobs he completed or how quickly he completed them, he would have received the same fixed compensation each and every month. *See also Bulaj*, 2010 WL 4237851, at *6 ("Bulaj had no opportunity for additional profit or loss … because his compensation consisted of a fixed, bi-weekly salary... ."); *Harper v. Wilson*, 302 F. Supp. 2d 873, 879 (N.D. Ill. 2004) ("Regardless of Harper's performance, she would still receive the same bi-monthly salary... ."). Moreover, Kibbons emphasizes that he did not have the ability to work for any other employer during his time at Double Jack. PSOF ¶ 19; Pl. Br. at 2. So, if Kibbons is to be believed, then this was *not* a situation in which Kibbons could have used his managerial discretion to complete his projects at Double Jack more efficiently in order to make time for other work, thereby increasing his personal profits. *See Jaworski,* 2013 WL 1283534, at *4 ("Plainly, the plaintiffs had some opportunity and ability to work for other firms, and that fact strongly suggests that the plaintiffs did have the opportunity to increase their revenues.").

On this record, when all reasonable inferences are drawn in favor of Kibbons, he "had no opportunity, by performing [his] tasks efficiently and skillfully, to earn additional profit." *Solis*, 819 F. Supp. 2d at 751. So this factor does not conclusively favor Double Jack.

### 3. Investment

Turning to the third factor, "a worker who makes a large out-of-pocket investment in his job is more likely to be an independent contractor" than an employee. *Jaworski*, 2013 WL 1283534, at *4. "[N]egligible items or labor itself" do not count. *Lauritzen*, 835 F.2d at 1537. So, if the only thing that Kibbons contributed to his work was his labor, then that would point to employee status. In contrast, if Kibbons paid for most of his own tools, equipment, and materials, then he is more likely to be an independent contractor. In *Bulaj*, for instance, this factor weighed in favor of employee status where the property management company "supplied almost all of the required materials" for maintenance work and even reimbursed the worker for a tool purchase on "one occasion." 2010 WL 4237851, at *7.

Here, the subject of Kibbons's investment in tools and equipment is yet again rife with factual disputes. Double Jack contends that Kibbons "utilized his own equipment in providing services to Double Jack." DSOAF ¶ 49. In response, Kibbons asserts that Double Jack actually reimbursed him for "*all* the equipment that he would purchase and use," and what is more, Double Jack even gave him "access to their credit account at home improvement stores." Pl. Resp. DSOAF ¶ 49 (emphasis added). Kibbons also asserts that Double Jack provided him with a credit *card* with

his name on it that he could use to purchase supplies. PSOF ¶ 24. (Double Jack, of course, disputes all of these claims. Def. Resp. PSOF ¶¶ 24, DSOAF ¶ 49.) Indeed, says Kibbons, when he was terminated from his position in 2017, he did not take any equipment with him because it all belonged to Double Jack. PSOF ¶ 42.

Double Jack argues, however, that many of Kibbons's allegations on this point are contradicted by his tax returns, in which he took deductions on expenses incurred by his company, Kibbons International. Def. Reply Br. at 3. Specifically, he apparently listed $7,661 of car and truck expenses; $1,170 in supplies; and $1,887 in insurance. Kibbons Tax Return at 6. According to Double Jack, these expenses were incurred by Kibbons via his company, Kibbons International, "*and used to provide services for Defendants.*" Def. Reply Br. at 3. Moreover, Double Jack notes that Kibbons took out commercial liability insurance on behalf of Kibbons International, "something no employee would do." *Id.*; Kibbons Insurance Policy.

In addition to tools and equipment, courts evaluating this factor have also considered whether the worker was allowed to hire others to assist them. *See Perez*, 55 F. Supp. 3d at 1077 (finding employee status where employer "provides insurance, vehicles, transportation expenses, and cleaning supplies" and employees were not allowed to "contract out work or hire others to assist them"); *Skokie Maid*, 2013 WL 3506149, at *8 (finding employee status where there was "no evidence that the maids were required to bring anything to the worksite except themselves" and they were not allowed to hire assistants). Here, Double Jack argues that Kibbons "hired and supervised his own crews to complete work at Double Jack." DSOAF ¶ 47. In support,

Double Jack points to a 2009 "Kibbons International" work invoice detailing the hours worked by someone named Wilbur Burton. *Id.*; Burton Invoice. According to Double Jack, Kibbons subcontracted his work out to other parties on "multiple occasions," which is allegedly something that no employee would ever be allowed to do. Def. Br. at 6 (citing *Derolf v. Risinger Bros. Transfer, Inc.*, 259 F. Supp. 3d 876, 880 (C.D. Ill. 2017)). In response, Kibbons points out that the invoice cited by Double Jack is of unknown origin, contains unknown handwriting, and only shows the name of one *individual*, not an entire "crew." Kibbons Resp. and Reply Br. at 5. And at most, Kibbons argues, only one or two other individuals ever performed work for Double Jack, and Kibbons neither hired nor paid them. *Id.* at 6; Pl. Resp. DSOAF ¶ 47. Furthermore, even if Double Jack is correct that Kibbons hired a subcontractor on at least one occasion, it would still be necessary to place that event within the context of the eight-year-long working relationship; it is possible that a reasonable trier of fact could nonetheless find that, all things considered, this factor weighs in favor of Kibbons despite the hiring of a subcontractor.

It is plain that there are factual disputes surrounding the origins of the tools, materials, and equipment that Kibbons used at Double Jack, as well as the question of whether (or how frequently) Kibbons hired subcontractors to work for him. Thus, this factor does not conclusively weigh in favor of Double Jack.

19

#### 4. Specialized Skills

In general, "certain highly specialized job skills support independent contractor classification." *Perez*, 55 F. Supp. 3d at 1077. In contrast, courts have held that maintenance work, including "cleaning, sweeping floors, mowing grass, unclogging toilets, changing light fixtures, and cleaning gutters," does not weigh in favor of independent-contractor status. *Bulaj*, 2010 WL 4237851, at *7; *see also Perez*, 55 F. Supp. at 1077. Here, it is undisputed that the work Kibbons performed for Double Jack did not involve any sort of specialized skills for FLSA purposes; the work did not require any professional licenses or advanced training, nor did Kibbons have any licenses or training like that. Pl. Br. at 4. So, this factor weighs in favor of Kibbons being an employee.

#### 5. Duration and Permanency

Similarly, it is undisputed that Kibbons worked for Double Jack for at least eight consecutive years, from 2008 to early 2017. PSOF ¶ 4. "The more permanent the relationship, the more likely the worker is to be an employee." *Perez*, 55 F. Supp. at 1078 (cleaned up). Here, there is nothing in the record to suggest that the parties anticipated any end date to the working relationship. It sounds like Kibbons was hired indefinitely, rather than for a specific length of time or for any particular project; indeed, Double Jack brought him onboard to simply "take care of everything." PSOF ¶ 12. *See Brown v. BCG Attorney Search*, 2013 WL 6096932, at *2 (N.D. Ill. Nov. 20, 2013) ("Finally, in considering the length of job commitment and potential

expectations, it is undisputed that Brown was given 'assignments' or 'projects' ... and that Brown was originally paid on a per project basis.").

Moreover, Kibbons alleges that he did not work for any other employer over the entire period. PSOF ¶ 19. In support, Kibbons notes that even if he did want to work for other employers, he could not have done so as a practical matter "due to the time commitments required of his position by Strumillo." Pl. Resp. and Reply Br. at 4. Double Jack, for its part, suggests that Kibbons might have had "alternative sources of income" based on his tax returns, Def. Resp. PSOF ¶ 19, which Kibbons denies, PSOF ¶ 19. So at the very least, this factor is disputed. (Double Jack also maintains that Kibbons "worked for himself" through his company, Kibbons International. Def. Resp. PSOF ¶ 19. But for purposes of this factor, that seems like a rather circular argument—if it were true, no independent contractor could ever satisfy this factor because they would always technically be working for themselves in addition to the employer in question.)

Thus, resolving all disputes in favor of Kibbons, a reasonable trier of fact could find that this factor also supports employee status.

### 6. Integral to Business

The final factor to consider is whether the services provided by Kibbons were an "integral" part of Double Jack's business. *Lauritzen*, 835 F.2d at 1537. Here, the parties do not dispute that Double Jack's "purpose is to maintain and collect rents from the tenants." DSOAF ¶ 43. But according to Double Jack, that is all there is to it. Double Jack is "in the business of renting apartments, not in providing

maintenance service." *Id.* ¶ 63. Anything else, including the maintenance and repair services provided by Kibbons, were merely "ancillary" to Double Jack's main business. Def. Br. at 5. In fact, Strumillo explicitly testified that Kibbons's work was not integral to the business. Strumillo Dep. Tr. at 355:5-6.

In response, Kibbons argues that "maintaining property is an integral responsibility of any landlord." Pl. Resp. and Reply Br. at 5. Specifically, Kibbons asserts that "maintaining the shape and livability of the apartment units available for rent; collecting rental applications, signed leases, rent checks; showing available apartments; and delivering eviction notices are all integral parts of a business that rent[s] apartments." Pl. Resp. DSOAF ¶ 63.

There are actually two distinct arguments embedded in this response. First, Kibbons is asserting that maintenance work *is* integral to a property-management business; if the apartments are not properly maintained, no one will rent them. *See Bulaj*, 2010 WL 4237851, at *10 ("There can be no dispute that Wilmette would lose its customers and accounts if the properties it was hired to manage were in disrepair and dirty."). But separately, Kibbons appears to be saying that he also performed tasks that squarely fall under property-management duties—collecting rental applications, signed leases, and rent checks, as well as showing available apartments to prospective tenants. So, in other words, even if *maintenance* is not an integral part of Double Jack's business, Kibbons performed enough *management* tasks to deem his services as integral to Double Jack's business.

Not surprisingly, Double Jack disputes both of these propositions. As mentioned above, Double Jack disagrees that maintenance work is an integral part of its property-management business. And as for Kibbons's assertion that he performed tasks like collecting rent checks and showing apartments to prospective tenants, Double Jack concedes that he might have been asked to perform those tasks "from time to time," but denies that they were part of his regular activities or duties. Def. Resp. PSOF ¶¶ 36-39. At this stage, though, considering these competing inferences in the light most favorable to Kibbons, a reasonable trier of fact could certainly find in favor of Kibbons on both points and conclude that his services constituted an integral part of Double Jack's business.

### 7. Other Considerations

So, when all reasonable inferences are drawn in favor of Kibbons, it is entirely possible for all six *Lauritzen* factors to support employee status. But beyond the six factors, Double Jack points to a few additional facts that bear on the "economic reality" of the relationship and whether Kibbons was economically dependent on Double Jack, or whether he was merely "in business for [himself]" as an independent contractor. *Lauritzen*, 835 F.2d at 1537. Indeed, Double Jack essentially forgoes any in-depth discussion of the *Lauritzen* factors in its briefing and instead argues that as a matter of economic reality, Kibbons "accepted payments and treated himself and his business, Kibbons International, as an independent contractor, in the most advantageous way to himself, for over five years, without any objection to the way in

which he was being paid, or the manner in which he was being treated by Double Jack." Def. Br. at 5.

For instance, there is the undisputed fact that Double Jack compensated Kibbons via IRS Form 1099. DSOAF ¶ 58. *See also Bulaj*, 2010 WL 4237851, at *8 ("The Seventh Circuit has found that tax forms and tax returns are indispensable when determining whether a worker is an employee or independent contractor.") (citing *Suskovich*, 553 F.3d at 568). According to Double Jack, the 1099 tax forms matter because Kibbons consistently received them without any objection, which means that he accepted that he was an independent contractor, as opposed to an employee. Def. Reply Br. at 3. *See also Brown*, 2013 WL 6096932, at *2 ("Even more indicative of an independent contractor status, Brown admits that she was compensated for all assignments completed via IRS Form 1099."). Kibbons, however, argues that the tax forms are not dispositive. Pl. Resp. and Reply Br. at 2. Regardless of the 1099 forms, argues Kibbons, he always considered himself to be an employee. Pl. Resp. DSOAF ¶ 59.

And speaking of tax treatment, perhaps the most important additional consideration here is Kibbons International, the company that Kibbons might or might not have operated while working for Double Jack. In support, Double Jack points to a Schedule C tax filing by Kibbons, in which he took deductions for all sorts of expenses and equipment stemming from his work for Double Jack (including car and truck expenses, insurance, legal and professional services, office expenses, and uniforms). Kibbons Tax Return at 6. Kibbons also claimed $31,368 in gross business

income, which, according to Double Jack, was derived from "the exact same work which Plaintiff is *now* claiming was actually done as an employee of Defendants and were actually wages." DSOAF ¶ 53; Def. Br. at 4. Not only that, but he also maintained commercial liability insurance, leased space for his handyman business, sent invoices to Double Jack on behalf of Kibbons International, and received payments on checks made out to Kibbons International. DSOAF ¶¶ 55-58.

Kibbons's only real response to all this is his insistence that Kibbons International was merely a "defunct Amway business" and was in no way operational during the time period in question. Pl. Resp. DSOAF ¶ 51. The only reason he took deductions for equipment and expenses was because he "had no choice" after Double Jack issued him a Form 1099 (instead of a W-2); he was merely making the "appropriate deductions" based on the issuance of the 1099. *Id.* ¶ 52. Moreover, any reference to Kibbons International in the course of the parties' dealings was purely accidental—for instance, Kibbons only sent Double Jack invoices from Kibbons International because he was simply reusing old forms from when the business was still operational. *Id.* ¶ 58. And even though Kibbons does not appear to dispute that some paychecks were made out to Kibbons International, he emphasizes that Double Jack has only pointed to *three* such checks over the course of the eight-year working relationship. *Id.* ¶ 57. He also plainly disputes ever leasing space for a handyman business. *Id.* ¶ 55. Finally, he explains that he maintained liability insurance in his personal capacity, not for Kibbons International, and he only did so because Strumillo ordered him to. *Id.* ¶ 56. At this stage, it is not the proper role of the Court to weigh

the relative believability of Kibbons's testimony against the documentary evidence that Double Jack points to. What matters is Kibbons has also put forth several disputes of material fact—based on his personal knowledge (or what he purports to be his personal knowledge)—on the subject of Kibbons International, which is enough to preclude summary judgment in favor of Double Jack.

Finally, it is necessary to briefly address the factual disputes surrounding how the parties themselves understood their relationship. Double Jack essentially argues that it treated Kibbons like an independent contractor the entire time, and Kibbons never objected. DSOAF ¶¶ 59-60. Double Jack supposedly never told Kibbons he was an employee, nor did Double Jack hold Kibbons out to tenants as an employee. Def. Resp. PSOF ¶ 30. Kibbons, however, argues that believed he was an employee from the start. Pl. Resp. DSOAF ¶¶ 59-60. After all, he continued to submit hourly invoices to Strumillo even after Double Jack started paying him a monthly flat rate, precisely because he expected to be compensated for the difference between what he was owed ($18.00 an hour) and what he was getting paid ($2,500 a month). *Id*. And, according to Kibbons, Strumillo definitely presented him as an employee of Double Jack; Kibbons testified that "numerous documents" identified Kibbons as the "onsite manager" of Double Jack. PSOF ¶ 30; R. 86-1, Kibbons Dep. Tr. at 135:2-7. Indeed, Strumillo himself even testifies that Kibbons might have been given a business card listing him as the "onsite manager" of Double Jack. Strumillo Dep. Tr. at 301:22-24.

In short, if all the factual disputes are resolved in favor of Kibbons, a reasonable trier of fact could certainly conclude that he was an employee instead of

an independent contractor. Because the Court cannot at this stage say as a matter of law that Kibbons was an independent contractor, the Defendants' motion for summary judgment must be denied.

## B. Kibbons's Motion

But just because Kibbons *might* be able to prove that he was an employee does not mean that he necessarily *will* prove it. Rather, turning to Kibbons's motion for summary judgment, the Court will now draw all reasonable inferences in favor of Double Jack and Strumillo. Here, too, it turns out that there are too many factual disputes to conclude as a matter of law that Kibbons was an employee. With the reasonable-inferences shoe on the other foot, Kibbons's motion for summary judgment must also be denied.

## 1. Employer Control

As explained above, there are myriad factual disputes about the degree of control that Double Jack exercised over the manner of Kibbons's work. For instance, the parties quarrel over the extent to which Kibbons was allowed to set his own schedule and hours—Double Jack says that Kibbons had "complete autonomy," DSOAF ¶ 61, while Kibbons argues that Strumillo expected him to be onsite every day from morning until night, PSOF ¶ 33. But this time, resolving all factual disputes in favor of *Double Jack*, a trier of fact could reasonably find that Kibbons *did* have the autonomy to set his own schedule and control the manner of his work.

Kibbons paints a picture of a relatively intense work environment in which he "acted at Double Jack's direction in almost daily text messages from Defendant

Strumillo commanding and instructing Plaintiff what job or task needed attention" and "was required to be available at all hours on Defendants' schedule." Pl. Resp. and Reply Br. at 4. But Defendants dispute this version: Strumillo testified that Kibbons "maintained his own hours and set his own schedule." DSOAF ¶ 48; Strumillo Decl. ¶ 11. Kibbons takes issue with this testimony, arguing that it is merely "conclusory." Pl. Resp. and Reply Br. at 4. But Strumillo is in a position to have personal knowledge of Kibbons' authority over his work schedule, so Strumillo is allowed to "use his own declaration and deposition testimony to create a material factual dispute" on this issue. *Singer v. Pace Suburban Bus Serv.*, 2019 WL 6497376, at *2 (N.D. Ill. Dec. 3, 2019) (citing *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013)).

Moreover, it is undisputed that "Strumillo did not keep track of the work or daily tasks that Kibbons was completing during the hours that were reported to him." PSOF ¶ 21. It is also undisputed that the parties exchanged "hundreds" of text messages related to work assignments. PSOF ¶ 31. But when contextualized over the course of eight years, "hundreds" might actually be not a lot of text messages. Thus, drawing all inferences in favor of Double Jack, it could very well be the case that Strumillo would only sporadically text Kibbons to notify him of projects that needed to be completed, and then Kibbons would proceed to address those projects on his own time and at his own pace. In other words, Kibbons did not necessarily have be onsite every day. In fact, Kibbons himself testified that "[a] lot of times," Strumillo came in on Sunday when Kibbons was not even there, which suggests that there were at least some instances in which Kibbons did not need to come in. Kibbons Dep. Tr. 112:22-

23. In light of the record evidence, a reasonable trier of fact could find that Kibbons exercised sufficient control over his own work to weigh in favor of independent contractor status.

## 2. Opportunity for Profit and Loss

Turning to the next factor, there is also substantial disagreement over whether Kibbons was able to increase his profits through managerial discretion. *Lauritzen*, 835 F.2d at 1536. As mentioned earlier, neither party's briefs really address this factor, although Kibbons does argue that he "never attempted or intended to profit on the variety of tool and equipment purchases that he had to make either on his own or at the direction of Strumillo." Pl. Br. at 3.

Even if Kibbons did not intend to profit on his tool purchases, Double Jack has created a sufficient factual dispute about the degree to which Kibbons purchased his own tools and materials. Specifically, Double Jack explicitly argues that Kibbons "utilized his own equipment in providing services to Double Jack." DSOAF ¶ 49. So conceivably, there could have been at least some room for Kibbons to control his own equipment costs—and thus control his profits. *See Bennett v. Unitek Glob. Servs., LLC*, 2013 WL 4804841, at *8 (N.D. Ill. Sept. 9, 2013) ("Moreover, Plaintiffs overlook the fact that they were permitted to purchase their own vehicles, tools, insurance, and licensure fees. This allowed Plaintiffs to control the overhead costs of their business, which in turn affected their profits."). Speaking of costs, Double Jack also identifies a Kibbons International invoice listing the hours worked by an individual named Wilbur Burton, who Double Jack asserts was a subcontractor that Kibbons

hired and paid, DSOAF ¶ 47, which Kibbons of course disputes, Pl. Resp. DSOAF ¶ 47. But taking Double Jack's version of events as true, it appears that Kibbons, who was paid $18.00 an hour at the time, hired a subcontractor at a rate of $10.00 an hour, which would have allowed him to pocket $8.00 an hour while someone else did the work. Depending on how often Kibbons engaged in these sorts of transactions, a trier of fact could find that he was able to profit quite a bit over the course of the relationship.

Finally, as discussed above, there is substantial disagreement about whether Kibbons was free to set his own hours, which would in turn bear on the question of whether he was able to work for other employers. This is especially relevant during the later part of the relationship, when Kibbons was being paid a flat rate of $2,500 per month. Def. Resp. PSOF ¶ 12. Double Jack explicitly asserts that Kibbons was "free to work for any other company," although the record citation provided by Double Jack does not appear to support this claim. *Id.* Nonetheless, Double Jack also points to Kibbons's tax returns and notes that based on his claimed income, he likely had alternative sources of income. *Id.* ¶ 19. *See Jaworski*, 2013 WL 1283534, at *4 ("Plainly, the plaintiffs had some opportunity and ability to work for other firms, and that fact strongly suggests that the plaintiffs did have the opportunity to increase their revenues."). So, taking Double Jack's version of events as true, this factor does not conclusively support employee status.

### 3. Investment

As discussed above, the parties also dispute the extent to which Kibbons used his own equipment and supplies. To recap, Kibbons maintains that Double Jack reimbursed him for *all* tool and equipment purchases, Pl. Resp. DSOAF ¶ 49, whereas Double Jack argues that they only reimbursed him on a case-to-case basis, and he otherwise used his own equipment on the job, Def. Resp. PSOF ¶ 22; DSOAF ¶ 49. This time, drawing all reasonable inferences in favor of Double Jack, a reasonable fact-finder could find in favor of independent contractor status.

For instance, Double Jack explicitly claims that Kibbons used his own equipment on the job. DSOAF ¶ 49. Indeed, this is supported by some of Kibbons's own testimony, such as when he testified that he brought his own personal ladder to work. Kibbons Dep. Tr. at 115:3-7. Double Jack also denies ever giving Kibbons a credit card with his name on it to use for tool purchases. Def. Resp. PSOF ¶ 24. Moreover, there is the issue of Kibbons's Schedule C tax form, on which he appears to claim deductions for multiple business expenses, including car and truck expenses, insurance, and supplies. Kibbons Tax Form at 6. According to Double Jack, these were precisely the same expenses that Kibbons incurred in the course of working for Double Jack. Def. Reply Br. at 3. Finally, Strumillo testifies in his declaration that Kibbons "hired and supervised his own crews to complete work at Double Jack," Strumillo Decl. ¶ 13, which is enough to create a dispute of material fact on Kibbons's claim that he never hired any "crews" to work under him. Pl. Resp. DSOAF ¶ 47. Thus, this factor does not conclusively support employee status.

### 4. Specialized Skills

Because it is undisputed that the work Kibbons performed for Double Jack did not require any sort of specialized skills or advanced training, this factor supports employee status and thus still cuts in favor of Kibbons.

### 5. Duration and Permanency

Similarly, it is undisputed that Kibbons worked for Double Jack for at least eight consecutive years, from 2008 to early 2017. PSOF ¶ 4. Moreover, as discussed above, there is nothing in the record to suggest that the parties anticipated any end date to the working relationship; it seems like Kibbons was hired indefinitely, as opposed to just for a specified length of time or for any particular project.

That being said, as mentioned above, there does seem to be some disagreement over whether Kibbons was allowed to (or in fact did) work for other employers, which could be relevant to the "permanency" aspect. Again, it is not the place of the Court to weight the competing evidence at this point; what matters is that there exists a dispute on this topic. Assuming that Kibbons was allowed to work for other employers, as Double Jack claims, Def. Resp. PSOF ¶ 19, then that would cut against permanency. So, this factor does not clearly support employee status.

### 6. Integral to Business

With regard to this final factor, the parties dispute whether maintenance services are an integral part of a property-management company. As discussed earlier, Kibbons argues that maintenance services *are* integral to Double Jack's business, Pl. Resp. DSOAF ¶ 63, while Double Jack is adamant that it is "in the

business of renting apartments, not in providing maintenance service," DSOAF ¶ 63. Kibbons also asserts that in addition to maintenance tasks, he collected rental applications, delivered eviction notices, and showed available apartments to prospective tenants. Pl. Resp. DSOAF ¶ 63. Double Jack, however, argues that Kibbons was only asked to help out with leasing-related tasks "from time to time" and that they were not part of his regular activities. Def. Resp. PSOF ¶¶ 37-39.

This time, viewing the evidence in the light most favorable to Double Jack, a reasonable trier of fact could find that Kibbons's maintenance services were not integral to Double Jack's business. Even if maintenance services are *important* to a property-management business, that does not necessarily mean they are integral in the sense contemplated by the FLSA. For instance, it would be one thing if Double Jack were itself a property-*maintenance* company—in that case, it would be straightforward to say that a property-maintenance worker would be "integral" to the maintenance company. *See Solis*, 819 F. Supp. 2d at 753 (security guards "who were at the clients' worksites actually performing the services" offered by security company were an integral part of the business). But here, Double Jack is a property-*management* company. Drawing all reasonable inferences in light of Double Jack, the main purpose of the company is "to maintain and collect rents from the tenants." DSOAF ¶ 43. And to the extent that Kibbons helped with rent-related tasks, Double Jack maintains that such instances were rare in the context of the entire working relationship. Def. Resp. PSOF ¶¶ 36-39. Thus, this factor does not conclusively support employee status.

### 7. Other Considerations

In arguing for summary judgment, Kibbons largely focuses on the six factors. In contrast, Double Jack highlights several facts outside the scope of the factors, including the parties' tax treatment and Kibbons' alleged use of Kibbons International. The Court agrees with Double Jack that these facts, while not dispositive, are at least relevant to assessing the economic reality of the parties' working relationship.

Thus, turning again to the issue of the parties' tax treatment, though this time viewing the evidence in the light most favorable to Double Jack, a reasonable trier of fact could find that Kibbons understood himself to be an independent contractor. For one, there is the undisputed fact that Double Jack compensated Kibbons via IRS Form 1099. DSOAF ¶ 58. *See also Bulaj*, 2010 WL 4237851, at *8. Although Kibbons denies that tax forms mean anything, Pl. Resp. and Reply Br. at 2, Double Jack claims that the 1099 forms are evidence of Kibbons accepting his as independent contractor status. Def. Reply Br. at 3. *See also Brown*, 2013 WL 6096932, at *2. In addition, even though Kibbons claims that Strumillo held him out to tenants as an "onsite manager" (and thus, presumably, employee) of Double Jack, PSOF ¶ 30, Double Jack is adamant that it never presented Kibbons as an employee and always treated him as an independent contractor, Def. Resp. PSOF ¶ 30.

Similarly, when it comes to Kibbons International, a reasonable trier of fact could find that while working for Double Jack, Kibbons "operated his own for-profit business in the most tax advantageous way for himself." Def. Reply Br. at 2. Kibbons's

response to this is that Kibbons International was merely a "defunct Amway business." Pl. Resp. DSOAF ¶ 51. But Double Jack has offered a number of material factual disputes on this point. Most prominently, Double Jack points to Kibbons's 2014 tax filings on behalf of Kibbons International, in which he took deductions for all sorts of expenses and equipment arising from his work for Double Jack. Kibbons Tax Return at 6. As explained above, Kibbons also claimed $31,368 in gross business income, which, according to Double Jack, was the same income that Kibbons now claims were wages from Double Jack. DSOAF ¶ 53; Def. Br. at 4. Double Jack also points to invoices and paychecks bearing the name "Kibbons International" and argues that Kibbons leased space and maintained commercial liability insurance for his business. DSOAF ¶¶ 55-58.

Kibbons, as discussed earlier, disputes all of these points. Pl. Resp. DSOAF ¶¶ 51-58. But because Double Jack has raised a number of material factual disputes that bear on the economic reality of the relationship at issue here, the Court cannot conclude as a matter of law that Kibbons was an employee. Thus, Kibbons's motion for summary judgment must also be denied.

## IV. Conclusion

Because the Court cannot conclude as a matter of law that Kibbons was either an employee or an independent contractor, both motions for summary judgment must be denied. It must be said that neither motion came close to winning, and both sides unfortunately and unnecessarily expended time and attorneys' fees on the doomed cross-motions. If it was not plain before, it should be crystal clear now that both sides

bear litigation risk, and the time for a genuine settlement effort is now, well before the enormous effort of putting together a Proposed Pretrial Order (see Judge Chang's website for the very detailed requirements). The status hearing of April 30, 2020 remains in place, but if the parties want another settlement referral, they should email the courtroom deputy by April 23, 2020 to request it. Otherwise, the parties shall file a status report by April 23, 2020, stating (1) whether they want a jury or a bench trial; and (2) the anticipated length of any trial (including jury selection, jury addresses, and jury deliberations) and possible trial weeks that the parties and witnesses are available.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 20, 2020